1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9
10
11

| | |
|---|---|
| CONTINENTAL WESTERN INSURANCE COMPANY,<br><br>                              Plaintiff,<br><br>        v.<br><br>STRIPE RITE, INC., et al.,<br><br>                              Defendants. | CASE NO. C19-5900 BHS<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT |

12
13
14
15
16
17

        This matter comes before the Court on Defendants Steven Bateman, Garth

Glasman, SLI, LLC ("SLI"), and Stripe Rite, Inc.'s ("Stripe Rite") (collectively

"Defendants") motion to dismiss, Dkt. 15, and motion for summary judgment, Dkt. 21,

and Plaintiff Continental Western Insurance Company's ("Continental") motion for

summary judgment, Dkt. 16.  The Court has considered the pleadings filed in support of

and in opposition to the motions and the remainder of the file and hereby rules as follows:

18
19
20
21
22

# I.   PROCEDURAL HISTORY

On September 25, 2019, Continental filed a complaint against Defendants seeking a declaration whether it has a duty to defend Defendants in the related case *Board of Trustees of the Employee Painters' Trust, et al. v. Stripe Rite, Inc.*, Case No. 2:19-cv-00223-RAJ.  Dkt. 1.  On December 10, 2019, Continental filed an amended complaint seeking the same declaration.  Dkt. 13.

On December 26, 2019, Defendants filed a motion to dismiss, Dkt. 15, and Plaintiff filed a motion for summary judgment, Dkt. 16.  On January 21, 2020, Plaintiff responded, Dkt. 20, and Defendants responded and filed a cross-motion for summary judgment, Dkt. 21.  On February 14, 2020, both parties replied.  Dkts. 26, 27.

# II.   FACTUAL BACKGROUND

## A.   Original Company, Unions, and Trusts

Stripe Rite was formed in 1984 and has since been in continuous operation.  Dkt. 22, Declaration of Garth Glasman ("Glasman Decl."), ¶ 3.  Stripe Rite is headquartered in Sumner, Washington.  *Id*. ¶ 4.  Stripe Rite provides pavement-marking, sign manufacturing, curb installation, crack repair, seal coating, and related services to customers in Washington and neighboring states. Stripe Rite's President and sole owner is Steve Bateman.  *Id*

From June of 1995 until December 31, 2018, Stripe Rite was party to a series of Collective Bargaining Agreements with Locals of the District Council 5 of the International Union of Painters and Allied Trades ("IUPAT") as well as IUPAT Locals 300, 427, and 1964 (collectively, the "Union").  *Id*. ¶ 5.  Most recently, Stripe Rite and

the Union entered a collective bargaining agreement ("CBA") effective January 1, 2016

through December 31, 2018. *Id*. Exh. 1.

The CBA made the Union the "exclusive bargaining agent" for the following

employees: "All installation or construction employees performing painting, parking and

highway improvement work including regular, part time journeymen painters, apprentice

painters, master traffic control stripers and working foreperson employed by [Stripe Rite]

at or out of its facilities located in Bremerton, Kennewick, Sumner and Yakima,

Washington, but excluding office clerical employees, confidential employees,

professional employees, guards and supervisors as defined in the National Labor

Relations Act." *Id.* Article 2, ¶ 1.

The provisions of the CBA—including its Trust contribution provisions—applied

to all "work of the type covered by this Agreement," even if that work was performed by

a Stripe Rite affiliate, so long as that work was "within the geographical jurisdiction of

this Agreement." *Id.* Article 7,¶ 4.  The CBA did not define the phrase "geographic

jurisdiction of this Agreement," but it did apply to relevant employees working "at or out

of [Stripe Rite's] facilities located in Bremerton, Kennewick, Sumner and Yakima,

Washington . . . ." *Id.* Article 2, ¶ 1.

The Employee Painters' Trust, Western Washington Painters Defined

Contribution Pension Trust, District Council No. 5 Apprenticeship and Training Trust

Fund, and International Painters and Allied Trades Industry Pension Fund ("Trusts") are

express trusts created pursuant to written declarations of trust ("Trust Agreements")

between various unions, including the Union, and various employer associations.  Dkt 1-

3, ¶ 5.  The Trusts exist to provide employee benefits to participants under a "multiemployer plan," "employee benefit plan," "employee benefit pension plan," and/or "employee welfare benefit plan." *Id.* ¶ 6.  These Trusts also were created and now exist pursuant to Section 302(c) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c), and are administered in Seattle, Washington. *Id.* ¶ 8.

The CBA required Stripe Rite to remit reports and contributions to the Trusts, and otherwise adhere to the Trust Agreements, for employees covered by the CBA.  CBA, Articles 19, 20.  The CBA also stated that Stripe Rite "shall not be bound by the terms of any Trust Agreement or the actions of Trustees of any Trust Fund unless the Employer is obligated to make contributions to such Fund pursuant to this Agreement." *Id.*, Article 19, § 3.

**B.     Insurance**

Continental issued insurance policies to Stripe Rite including a Commercial Lines Policy, No. 6013651–25 ("the Policy") for the period from April 11, 2018 to April 11, 2019.  Dkt. 1-2.  The Policy is a renewal of a prior policy, and includes Commercial General Liability coverage, Business Auto coverage, and Employee Benefits Liability Coverage.  *Id.*  The Policy includes Commercial Liability Umbrella coverage, and an endorsement to that coverage provides Employee Benefits Liability Coverage.  *Id.*

The relevant portion of the Policy is the Employee Benefits Liability Endorsement. The insuring clause provides in relevant part as follows:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of any act, error or omission of the insured, or of any other person for whose acts the insured is legally liable, to which

1    this insurance applies. We will have the right and duty to defend the insured
     against any "suit" seeking those damages. However, we will have no duty
2    to defend the insured any "suit" seeking damages to which this insurance
     does not apply.
3            No other obligation or liability to pay sums or perform acts or
     services is covered unless explicitly provided for under Supplementary
4    Payments.
             b. This insurance applies to damages only if:
5            (1) The act, error or omission is negligently committed in the
     "administration" of your "employee benefit program";
6            (2) The act, error or omission did not take place before the
     Retroactive Date, if any, shown in the Schedule nor after the end of the
7    policy period; and
             (3) A "claim" for damages, because of an act, error or omission, is
8    first made against any insured, in accordance with Paragraph c. below,
     during the policy period or an Extended Reporting Period we provided
9    under Paragraph F. of this endorsement.

10   Dkt 1-2 at 27.

11          The Endorsement defines "administration" as "providing information with respect

12   to," "handling records in connection with," or "effecting, continuing, or terminating any

13   employee's participation in, the 'employee benefit program.'" Dkt 1-3 at 31.

14   **C.    Dispute and Related Case**

15          In the spring of 2016, Michael Craig ("Craig") approached Stripe Rite and

16   inquired about whether Stripe Rite had any interest in acquiring his company, Sharp-Line

17   Industries, Inc. ("Sharp-Line"). Glasman Decl., ¶ 18. In June 2016, Stripe Rite and

18   Craig then negotiated and entered into an Asset Purchase Agreement (the "APA"). *Id.* ¶¶

19   18-19, Exh. 2. Sharp-Line was formed in Spokane, Washington in about 1990 by Craig

20   and Larry Fowler ("Fowler"). *Id.* ¶ 14. Neither Craig nor Fowler were affiliated or

21   involved with Stripe Rite at the time that they formed Sharp-Line or at any point before

22   June of 2016. *Id.* ¶ 15. Nor did Stripe Rite or any of its owners, officers or other

1  principals and employees have any involvement with Sharp-Line at any time before June

2  of 2016. *Id.* ¶ 16. Until June 2016, Sharp-Line was one of Stripe Rite's competitors for

3  striping and related pavement marking projects in and around the Spokane area. *Id.* ¶ 16.

4         Before acquiring Sharp-Line's assets, Stripe Rite and Glasman formed SLI. *Id.* ¶

5  24. Stripe Rite and Glasman are the sole members of SLI—Stripe Rite owns 85% and

6  Glasman owns 15%. *Id.* ¶ 25. On June 4, 2016, SLI and Sharp-Line signed the APA,

7  and SLI's acquisition of the assets of Sharp-Line closed on June 30, 2016. *Id.* ¶ 23.

8  Thereafter, SLI hired Sharp-Line's employees and one of the other former owners of

9  Sharp-Line, Steven Adams ("Adams"). *Id.* ¶ 26. SLI and Sharp Lines were maintained

10 as separate corporations, and Sharp-Line employees did not become Stripe Rite

11 employees. *Id.* SLI's employees continued to work out of Sharp-Line's Ferry Avenue

12 facility in Spokane. *Id.* ¶ 28. Between July 1, 2016, and the end of 2017, SLI performed

13 pavement marking, sign manufacturing, sign installation, and related services primarily to

14 general contractors and public agencies in and around Spokane. *Id.* ¶ 29. Sharp-Line's

15 employees were not represented by a union, and SLI did not consider its new employees

16 as members of Stripe Rite's CBA. *Id.* ¶¶ 27, 34.

17        Towards the end of 2017, Adams expressed a desire to retire and Stripe Rite had

18 concerns with SLI's antiquated accounting system. *Id.* ¶ 36. In early 2018, SLI

19 transferred its assets to Stripe Rite, Stripe Rite rebranded SLI's facility and assets, and

20 Stripe Rite hired SLI's employees as its employees. *Id.* ¶ 38. Glasman declares that

21 Stripe Rite's employees in the Spokane office, basically the former Sharp-Line

22 employees, were not part of Stripe Rite's CBA because none of them were employed "at

1  or out of its facilities located in Bremerton, Kennewick, Sumner and Yakima,

2  Washington" as defined in the CBA.  *Id.* ¶ 40.  Thus, "Stripe Rite was not required to

3  remit reports or trust fund contributions to the Trust's on behalf of its Spokane

4  employees."  *Id.*

5         In late 2018, Stripe Rite received written requests from 75% of its bargaining unit

6  employees indicating that they no longer desired to belong to or be represented by the

7  Union.  *Id.* ¶ 11.  Stripe Rite, therefore, notified the Union in early January of 2019 that it

8  was withdrawing recognition of the Union as the collective bargaining agent and since

9  then Stripe Rite has no longer remitted reports or contributions to the Trusts for any of its

10  employees.  *Id.* ¶ 12.

11         On February 15, 2019, the Trusts and their boards filed a complaint against

12  Defendants alleging violations of the CBA.  Dkt. 1-3.  The complaint asserts a cause of

13  action for breach of the CBA, violation of ERISA, and breach of the Trust agreements.

14  *Id.*  The complaint alleges that

15        63. At all times material herein, Stripe Rite, Bateman, Glasman, and
Does and Roes have operated Sharp Lines to avoid the obligations under
16  the CBA, including the obligations owed to the Plaintiffs.
      64. Stripe Rite, Sharp Lines, Bateman, Glasman, Does and Roes
17  have transferred projects, contracts, and covered labor between and
amongst Stripe Rite and Sharp Lines, have engaged in a series of business
18  transactions intended to transfer business and assets between and amongst
each other, and have commingled assets in an effort to avoid CBA
19  obligations.

20  *Id.*

21

22

ORDER - 7

# III.  DISCUSSION

The sole issue in the parties' three motions is whether Continental owes Defendants a duty to defend against the allegations in the related case.  Because Defendants have filed two dispositive motions on the exact same issue, the Court denies Defendants' motion to dismiss as moot in light of its summary judgment motion.  The parties have also narrowed the issues to whether (1) Defendants allegedly committed negligent acts in (2) the administration of the employee benefit program.  Dkt. 21 at 1. With regard to all other issues, the Court grants Continental's motion for summary judgment.  *See* Dkt. 26 (listing unopposed issues).

## A.    Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing

1   versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W.*

2   *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

3         The determination of the existence of a material fact is often a close question.  The

4   Court must consider the substantive evidentiary burden that the nonmoving party must

5   meet at trial—e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477

6   U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual

7   issues of controversy in favor of the nonmoving party only when the facts specifically

8   attested by that party contradict facts specifically attested by the moving party.  The

9   nonmoving party may not merely state that it will discredit the moving party's evidence

10  at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

11  *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

12  nonspecific statements in affidavits are not sufficient, and missing facts will not be

13  presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

14  **B.    Duty to Defend**

15        One of the remaining issues pertains to the allegations in the complaint, and the

16  other pertains to the construction of the insurance contract.  First, a liability insurance

17  policy provides a duty to defend, which "arises at the time an action is first brought, and

18  is based on the potential for liability."  *Woo v. Fireman's Fund Ins. Co.*, 161 Wn.2d 43,

19  53 (2007).  An insurer has a duty to defend "'when a complaint against the insured,

20  construed liberally, alleges facts which could, if proven, impose liability upon the insured

21  within the policy's coverage.'"  *Id*. at 53 (quoting *Unigard Ins. Co. v. Leven*, 97 Wn.

22  App. 417, 425 (1999)).  An insurer is not relieved of its duty to defend unless the claim

alleged in the complaint is "clearly not covered by the policy." *Id*. If a complaint is

ambiguous, a court will construe it liberally in favor of "triggering the insurer's duty to

defend." *Id*. at 53. "Insurance companies are required to look beyond the allegations of

the complaint and reasonably investigate when the allegations are in conflict with facts

known to or readily ascertainable by the insurer, or if the allegations of the complaint

were ambiguous or inadequate." *Leven*, 97 Wn. App. at 425.

　　Under these standards, the parties agree that the policy only covers negligent acts

but dispute whether the allegations in the related case allege negligent or intentional acts.

While the Court agrees with Defendants that a breach of contract may be based on

negligent or intentional acts, the allegations here, even liberally construed, do not sound

in negligence. For example, in *Publ'g House of the Evangelical Lutheran Church in Am.*

*v. Hartford Fire Ins. Co.*, 14-CV-550 JNE/BRT, 2015 WL 5472730 (D. Minn. Sept. 16,

2015), the underlying complaint alleged that "defendants were liable for underfunding the

Plan and failing to disclose information regarding the Plan's funding and the ability to

pay projected benefits." *Id.* at *1. The court concluded that the insurer had a duty to

defend because some of the alleged failures to fund and to properly disclose relevant

information "were arguably negligent." *Id.* at *3.

　　Similarly, in *Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136 (2d Cir.

2014), the underlying complaint was based on an alleged misclassification of an

employee. The court concluded that there was potential coverage because although the

"complaint contained allegations that bespeak malice[,] none of [the employee's] ERISA

1    claims alleged that [the employer] improperly classified her with the purpose of

2    interfering with her retirement benefits." *Id.* at 141.

3         In contrast to those cases, the relevant complaint here alleges intentional acts. For

4    example, the plaintiffs allege that Defendants operated the companies "to avoid the

5    obligations under the CBA." Dkt. 1-3, ¶ 63. They also allege that Defendants transferred

6    work and commingled assets "in an effort to avoid CBA obligations." *Id.* ¶ 64. Despite

7    these allegations of intentional acts, Defendants contend that there is a potential for

8    liability based on Glasman's assertions that he thought keeping the former business's

9    assets and employees in Spokane did not violate the CBA. They argue that this

10   misunderstanding of the CBA creates liability under a theory of negligence. In other

11   words, Defendants rely on facts outside the relevant complaint to establish the duty to

12   defend. The Court concludes that it must consider Glasman's declaration because the

13   allegations in the relevant complaint are inadequate as to liability and Glasman's

14   assertions are readily ascertainable. *Truck Ins. Exch. v. Vanport Homes, Inc.*, 147 Wn. 2d

15   751, 761 (2002) (citations omitted). ("facts outside the complaint may be considered if

16   (a) the allegations are in conflict with facts known to or readily ascertainable by the

17   insurer or (b) the allegations of the complaint are ambiguous or inadequate.").

18   Continental has failed to establish that the underlying breach of contract claim may only

19   be proven based on intentional conduct. This leaves open the possibility to establish the

20   claim through Glasman's negligence, which is aptly set forth in his declaration. Thus,

21   Continental's motion fails on the sole basis of intentional conduct.

22

1    Defendants, however, have failed to establish that any alleged acts occurred in the

2    administration of the employee benefit plan *as defined in the policy*.  Defendants argue

3    that the complaint requests damages for acts, errors, or omissions in administration of the

4    program, Dkt. 15 at 11, but they fail to address Continental's argument that the policy

5    further defines the term "administration" as "providing information with respect to,"

6    "handling records in connection with," or "effecting, continuing, or terminating any

7    employee's participation in, the 'employee benefit program.'" Dkt 1-3 at 31.  In other

8    words, there was no administration of an employee benefit program because Defendants

9    made the conscious decision not to include the relevant employees in those benefit

10   programs.  Defendants fail to establish a connection between intentionally not

11   administering a plan whatsoever, which is not covered by the policy, and negligently

12   administering some relevant aspect of a plan, which could potentially be covered by the

13   policy.  Therefore, the Court grants Continental's motion and denies Defendants' motion

14   on this issue as well.

15   **C.    Attorney's Fees**

16       Continental moves for a declaration that it is "entitled to all defense costs paid."

17   Dkt. 16 at 21.  Defendants contend that the request is beyond the scope of the complaint

18   because it is a claim for damages and, in any event, Continental has failed to submit any

19   evidence to establish that it has incurred any fee in defending Defendants under a

20   reservation of rights.  Dkt. 27 at 9.  The Court agrees on both grounds and denies

21   Continental's motion on this issue.

22

1

### IV.  ORDER

2      Therefore, it is hereby **ORDERED** that Defendants' motion to dismiss, Dkt. 15,

3   and motion for summary judgment, Dkt. 21, are **DENIED** and Continental's motion for

4   summary judgment, Dkt. 16, is **GRANTED in part** and **DENIED in part**.

5      The Clerk shall enter a **JUDGMENT** in favor of Continental and close the case.

6      Dated this 8th day of September, 2020.

7

8      _____

9      BENJAMIN H. SETTLE
       United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 13